**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF OKLAHOMA**

(1) CHILD DOE 1, a minor, by and through parent and next friend, PARENT DOE 1;

(2) CHILD DOE 2, a minor, by and through parents and next friend, PARENT DOE 2;

(3) CHILD DOE 3, a minor, by and through parent and next friend, PARENT DOE 3;

(4) CHILD DOE 4, a minor, by and through parents and next friend, PARENT DOE 4;

(5) CHILD DOE 5, a minor, by and through parent and next friend, PARENT DOE 5;

(6) CHILD DOE 6, a minor, by and through parent and next friend, PARENT DOE 6;

(7) CHILD DOE 7, a minor, by and through parent and next friend, PARENT DOE 7;

(8) JANE DOE 1;

(9) JANE DOE 2; and

(10) CHILD DOES 8-30.

      Plaintiffs,

v.

(1) TULSA COUNTY, ex. rel. JUVENILE BUREAU OF THE TULSA COUNTY DISTRICT COURT;

(2) BOARD OF COUNTY COMMISSIONERS OF TULSA COUNTY;

Case No: 6:24-cv-00182-JAR

ATTORNEY LIEN CLAIMED

JURY TRIAL DEMANDED

(3) ANTHONY TAYLOR; as former Director
     of the Juvenile Bureau;

(4) ALONDO EDWARDS, as Acting
     Director of the Juvenile Bureau;

(5) DOUGLAS CURRINGTON, as
     Superintendent of the Juvenile Bureau;

(6) CORTEZ TUNLEY, as former
     Superintendent of the Juvenile Bureau;

(7) JONATHAN HINES, former detention
     officer of the Juvenile Bureau;

(8) AUSTIN ZENZEN, former detention
     officer of the Juvenile Bureau;

(9) DQUAN DOYLE, former detention
     officer of the Juvenile Bureau, aka "DQ;"

(10) MANDI LEE RAYMOND, former
      employee of the Juvenile Bureau;

(11) CINDY TREADWAY, former employee
      of the Juvenile Bureau;

(12) JANE DOE 1, aka "DO Shalonda,"
      current or former detention officer of the
      Juvenile Bureau;

(13) JANE DOE 2, aka "DO Kelly," current
      or former detention officer of the
      Juvenile Bureau;

(14) JANE DOE 3, aka "Miss Carrie," current
      or former detention officer of the
      Juvenile Bureau;

(15) JANE DOE 4, aka "Miss Torrie," current
      or former detention officer of the
      Juvenile Bureau;

(16) JOHN DOES 1-10, current and former
      detention officers of the Juvenile Bureau;

(17) JANE DOES 5-14, current and former
     detention officers of the Juvenile Bureau;

(18) STATE OF OKLAHOMA, ex rel.
     OFFICE OF JUVENILE AFFAIRS;

(19) JEFFREY CARTMELL, as Director for
     the Office of Juvenile Affairs;

(20) RACHEL HOLT, as former Director for
     the Office of Juvenile Affairs; and

(21) BEN BROWN, as General Counsel for
     the Office of Juvenile Affairs,

     Defendants.

## FIRST AMENDED COMPLAINT

**COMES NOW** the Plaintiffs, CHILD DOE 1, a minor, by and through parent and next friend, PARENT DOE 1; CHILD DOE 2, a minor, by and through parents and next friend, PARENT DOE 2; CHILD DOE 3, a minor, by and through parent and next friend, PARENT DOE 3; CHILD DOE 4, a minor, by and through parents and next friend, PARENT DOE 4; CHILD DOE 5, a minor, by and through parent and next friend, PARENT DOE 5; CHILD DOE 6, a minor, by and through parent and next friend, PARENT DOE 6; CHILD DOE 7, a minor, by and through parent and next friend, PARENT DOE 7; JANE DOE 1; JANE DOE 2; and, CHILD DOES 8-30 (collectively "Plaintiffs"), by and through their attorneys of record, and for their causes of action against the Defendants, alleges and states as follows:

## INTRODUCTORY STATEMENT

1.      Plaintiff CHILD DOE 1, a minor, was incarcerated at the Detention Home of the Juvenile Bureau of the Tulsa County District Court (hereinafter "Juvenile Detention Center") for the period including April 2024.

2.      Plaintiff CHILD DOE 2, a minor, was incarcerated at the Juvenile Detention Center for the period of June 2023 to May 2024.

3.      Plaintiff CHILD DOE 3, a minor, was incarcerated at the Juvenile Detention Center for the period of February 2024 to the present.

4.      Plaintiff CHILD DOE 4, a minor, was incarcerated at the Juvenile Detention Center for the period of January 2024 to March 2024.

5.      Plaintiff CHILD DOE 5, a minor, was incarcerated at the Juvenile Detention Center for the period of November 2023 to May 2024.

6.      Plaintiff CHILD DOE 6, a minor, was incarcerated at the Juvenile Detention Center for the period of February 2024 to present.

7.      Plaintiff CHILD DOE 7, a minor, was incarcerated at the Juvenile Detention Center for the period of February 2024 to May 2024.

8.      Plaintiff JANE DOE 1, an adult, was incarcerated at the Juvenile Detention Center for the period of June 2023 to August 2023.

9.      Plaintiff JANE DOE 2, an adult, was incarcerated at the Juvenile Detention Center for the period of June 2023 to August 2023.

10.      For the length of Plaintiffs' detentions, Defendants failed to provide Plaintiffs with adequate and safe housing, supervision, and security in order to protect them from the known risk of serious physical harm, including but not limited to rape and/or sexual abuse.

11.     Over the course of Plaintiffs' detentions at the Juvenile Detention Center, each was sexually assaulted, harassed, and/or raped by detention officers or other staff at the Juvenile Detention Center, to-wit, including but not limited to, Defendants Jonathan Hines, Austin Zenzen, Dquan Doyle, Cindy Treadway, Mandi Lee Raymond, John Does, and Jane Does. As detention officers and other employees, it was Defendants duty to protect Plaintiffs from harm.  However, rather than protect them, these Defendants preyed on Plaintiffs.   Knowing the deficiencies in safety and security within the Juvenile Detention Center where their actions would be unmonitored and knowing of the persistent inadequate staffing, these Defendants had total control over juvenile detainees like Plaintiffs. In an utter betrayal of public trust and duty, these Defendants exploited their positions of power to rape and sexually assault defenseless minor children.

12.     The rapes and sexual assaults and harassments upon Plaintiffs were eminently preventable.  These heinous crimes were the foreseeable result of Defendants' policies, practices and/or customs of inadequate housing, supervision, and security. In sum, Defendants' deliberate indifference toward Plaintiffs' health and safety was a direct and proximate cause of their injuries and damages.

<u>**JURISDICTION AND VENUE**</u>

13.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Eighth Amendment and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

14.     The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve  a controversy arising under the Constitution and laws of the United States, particularly the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. This Court has jurisdiction over Plaintiffs' state law breach of contract claim because the federal question claims and the breach of contract claim "derive from a common nucleus of operative fact" and are "such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

15.     Venue is proper under 28 U.S.C. § 1391(b)(1) because one or more Defendants are subject to this court's personal jurisdiction with respect to the civil action in question. Defendant Dquan Doyle is a resident of Wagoner County, which is in the Eastern District of Oklahoma.

16.     Venue is also proper under 28 U.S.C. § 1391(e)(1)(C) because one or more Defendants are subject to this court's personal jurisdiction with respect to the civil action in question.  Defendant State of Oklahoma *ex. rel.* Office of Juvenile Affairs ("OJA") is subject to this Court's personal jurisdiction.

17.     Venue is proper under 28 U.S.C. § 1391(c)(2) because this action does not involve real property and at least one or more of the Plaintiffs, CHILD DOES 8-30 are residents of this judicial district who were at relevant times juvenile detainees at the Juvenile Detention Center and were subjected to the same treatment suffered by Plaintiffs herein.

## PARTIES

18.     Defendant Board of County Commissioners of Tulsa County ("BOCC") is a statutorily created governmental entity, incorporated under the laws of the State of Oklahoma and located in Tulsa County, State of Oklahoma. BOCC is responsible for the operation of the

Tulsa County Juvenile Detention Center ("Juvenile Detention Center"), through its oversight of Defendant Juvenile Bureau of the District Court of Tulsa County ("Juvenile Bureau").[1]  BOCC is required to discharge its responsibilities of operation and maintenance of the Juvenile Detention Center to the Juvenile Bureau in a constitutional manner. BOCC is responsible for the execution of a wide range of legal and fiscal responsibilities, including oversight of the Juvenile Bureau. BOCC contracted with OJA regarding the Juvenile Detention Center. BOCC approved a $13,070,125.00 budget for "juvenile detention" expenses, out of a $17.5 million budget total for "court related" items for the 2023-2024 fiscal year

19.     Defendant Juvenile Bureau is an agency within Tulsa County, that is located in Tulsa County, State of Oklahoma. The Juvenile Bureau contracts, through BOCC, with OJA, "for secure detention services." The Juvenile Bureau's mission is to "provide the necessary programming to address the criminal justice needs of Tulsa County youth and families."

20.     Upon information and belief that will be confirmed through discovery, Defendant Anthony Taylor ("Taylor") is the former Director of the Juvenile Bureau, who was, in part, responsible, during the relevant timeframes for this lawsuit, for overseeing Plaintiffs' health and well-being, and assuring that housing and security needs of Plaintiffs and other juveniles were met, during the time they were in the custody of the Juvenile Detention Center.

21.     Upon information and belief that will be confirmed through discovery, Defendant Alondo Edwards ("Edwards") is the Acting Director of the Juvenile Bureau, who was, in part, responsible, during the relevant timeframes for this lawsuit, for overseeing Plaintiffs' health and

---

[1]     57 O.S.  §  41 provides that "[e]very county, by authority of the board of county commissioners and at the expense of the county, shall have a jail or access to a jail in another county for the safekeeping of prisoners lawfully committed."

well-being, and assuring that housing and security needs of Plaintiffs and other juveniles were met, during the time they were in the custody of the Juvenile Detention Center.

22.     Upon information and belief that will be confirmed through discovery, Defendant Douglas Currington ("Currington") is the Superintendent of the Juvenile Bureau, who was, in part, responsible, during the relevant timeframes for this lawsuit, for overseeing Plaintiffs' health and well-being, and assuring that housing and security needs of Plaintiffs and other juveniles were met, during the time they were in the custody of the Juvenile Detention Center.

23.     Upon information and belief that will be confirmed through discovery, Defendant Cortez Tunley ("Tunley") is the former Superintendent of the Juvenile Bureau, who was, in part, responsible, during the relevant timeframes for this lawsuit, for overseeing Plaintiffs' health and well-being, and assuring that housing and security needs of Plaintiffs and other juveniles were met, during the time they were in the custody of the Juvenile Detention Center.

24.     Upon information and belief that will be confirmed through discovery, Defendant Jonthan Hines ("Hines") is, and was at all times relevant hereto, a resident of Tulsa County, Oklahoma. Hines was employed by BOCC as a detention officer at the Juvenile Detention Center, when he raped and sexually assaulted and harassed multiple Plaintiffs and other juveniles, during the time they were in the custody of the Juvenile Detention Center. At all pertinent times, Hines was acting within the scope of his employment and under the color of state law.

25.     Upon information and belief that will be confirmed through discovery, Defendant Austin Zenzen ("Zenzen") is, and was at all times relevant hereto, a resident of Tulsa County, Oklahoma. Zenzen was employed by BOCC as a detention officer at the Juvenile Detention Center, who sexually assaulted and abused at least one juvenile, and possibly others, during the

time they were in the custody of the Juvenile Detention Center. At all pertinent times, Zenzen was acting within the scope of his employment and under the color of state law.

26.     Upon information and belief that will be confirmed through discovery, Defendant Dquan Doyle ("Doyle") is, and was at all times relevant hereto, a resident of Wagoner County, Oklahoma. Doyle was employed by BOCC as a detention officer at the Juvenile Detention Center during the relevant times herein, who sexually assaulted and abused multiple Plaintiffs and other juveniles, during the time they were in the custody of the Juvenile Detention Center. At all pertinent times, Doyle was acting within the scope of his employment and under the color of state law.

27.     Upon information and belief that will be confirmed through discovery, Defendant Mandi Lee Raymond ("Raymond") is, and was at all times relevant hereto, a resident of Wagoner County, Oklahoma. Raymond was employed by BOCC as a nurse at the Juvenile Detention Center during the relevant times herein, who raped and sexually assaulted and harassed at least one Plaintiff and other juveniles, during the time they were in the custody of the Juvenile Detention Center. At all pertinent times, Raymond was acting within the scope of her employment and under the color of state law.

28.     Upon information and belief that will be confirmed through discovery, Defendant Cindy Treadway ("Treadway") is, and was at all times relevant hereto, a resident of Tulsa County, Oklahoma. Treadway was employed by BOCC as a detention officer at the Juvenile Detention Center during the relevant times herein, who knowingly allowed the sexual assault and harassment of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees, during the time they were in the

custody of the Juvenile Detention Center. At all pertinent times, Treadway was acting within the scope of her employment and under the color of state law.

29.     Upon information and belief that will be confirmed through discovery, Defendant JANE DOE 1, aka "DO Shalonda" is, and was at all times relevant hereto, a resident of Tulsa County, Oklahoma. DO Shalonda was employed by BOCC as a detention officer at the Juvenile Detention Center during the relevant times herein, who knowingly and intentionally allowed the sexual assault and harassment of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees, during the time they were in the custody of the Juvenile Detention Center. At all pertinent times, DO Shalonda was acting within the scope of her employment and under the color of state law.

30.     Upon information and belief that will be confirmed through discovery, Defendant JANE DOE 2, aka "DO Kelly" is, and was at all times relevant hereto, a resident of Tulsa County, Oklahoma. DO Kelly was employed by BOCC as a detention officer at the Juvenile Detention Center during the relevant times herein, who knowingly and intentionally allowed the sexual assault and harassment of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees, during the time they were in the custody of the Juvenile Detention Center. At all pertinent times, DO Kelly was acting within the scope of her employment and under the color of state law.

31.     Upon information and belief that will be confirmed through discovery, Defendant JANE DOE 3, aka "Miss Carrie" is, and was at all times relevant hereto, a resident of Tulsa County, Oklahoma. Miss Carrie was employed by BOCC at the Juvenile Detention Center during the relevant times herein, who knowingly and intentionally allowed the sexual assault and harassment of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile

Bureau detention officers and staff as well as other detainees, during the time they were in the custody of the Juvenile Detention Center. At all pertinent times, Miss Carrie was acting within the scope of her employment and under the color of state law.

32.     Upon information and belief that will be confirmed through discovery, Defendant JANE DOE 4, aka "Miss Torrie" is, and was at all times relevant hereto, a resident of Tulsa County, Oklahoma. Miss Torrie was employed by BOCC at the Juvenile Detention Center during the relevant times herein, who knowingly and intentionally allowed the sexual assault and harassment of multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees, during the time they were in the custody of the Juvenile Detention Center. At all pertinent times, Miss Torrie was acting within the scope of her employment and under the color of state law.

33.     Upon information and belief that will be confirmed through discovery, Defendants JOHN DOES 1-10 and JANE DOES 5-14 are current or former employees of BOCC working at the Juvenile Bureau, who either sexually abused and assaulted, or knowingly and intentionally allowed the sexual assault and harassment of, multiple Plaintiffs and other juveniles to occur, both at the hands of Juvenile Bureau detention officers and staff as well as other detainees, during the time they were in the custody of the Juvenile Detention Center. At all pertinent times, JOHN DOES 1-10 and JANE DOES 5-14 were acting within the scope of their employment and under the color of state law.

34.     Defendant OJA is an agency within the State of Oklahoma, which is subject to this court's personal jurisdiction with respect to the civil action in question and is located across the State of Oklahoma. OJA contracted with the BOCC and the Juvenile Bureau regarding the Juvenile Detention Center. Additionally, OJA was given the management of the State of

Oklahoma's juvenile affairs, including providing justice for serious and habitual juvenile offenders.

35.     Upon information and belief that will be confirmed through discovery, Defendant Jeffrey Cartmell ("Cartmell") is, and was at all times relevant hereto, a resident of Oklahoma County, Oklahoma. Cartmell is the Director for OJA, who "shall be responsible for the care and custody of a youthful offender who has been placed in the custody of the Office of Juvenile Affairs and shall have the duty and the authority to provide food, clothing, shelter, ordinary medical care, education, discipline and in an emergency to authorize surgery or other extraordinary care."  OKLA. STAT. tit. 10A, § 2-5-212(D).  This includes responsibility for the Plaintiffs and other juveniles in the Juvenile Detention Center. At all pertinent times, Cartmell was acting within the scope of his employment and under the color of state law.

36.     Upon information and belief that will be confirmed through discovery, Defendant Rachel Holt ("Holt") is, and was at all times relevant hereto, a resident of Oklahoma County, Oklahoma. Holt was the former Director for OJA, until October 2023, who was "responsible for the care and custody of a youthful offender who has been placed in the custody of the Office of Juvenile Affairs and shall have the duty and the authority to provide food, clothing, shelter, ordinary medical care, education, discipline and in an emergency to authorize surgery or other extraordinary care."  OKLA. STAT. tit. 10A, § 2-5-212(D).  This includes responsibility for the Plaintiffs and other juveniles in the Juvenile Detention Center. At all pertinent times, Holt was acting within the scope of her employment and under the color of law.

37.     Upon information and belief that will be confirmed through discovery, Defendant Ben Brown ("Brown"") is, and was at all times relevant hereto, a resident of Oklahoma County, Oklahoma. Brown is the General Counsel for OJA, who "shall be responsible for the care and

custody of a youthful offender who has been placed in the custody of the Office of Juvenile Affairs and shall have the duty and the authority to provide food, clothing, shelter, ordinary medical care, education, discipline and in an emergency to authorize surgery or other extraordinary care." OKLA. STAT. tit. 10A, § 2-5-212(D).  This includes responsibility for the Plaintiffs and other juveniles in the Juvenile Detention Center. At all pertinent times, Brown was acting within the scope of his employment and under the color of state law.

## **FACTUAL ALLEGATIONS**

38.     Plaintiffs re-allege and incorporate by reference paragraphs 1 through 37, as though fully set forth herein.

39.     Plaintiffs were in the custody of the Juvenile Detention Center at various periods of time from June 2023 to the present.  During these periods of custody, Plaintiffs were all minors.

40.     On May 9, 2022, representatives of OJA met with Tulsa County representatives and stakeholders to discuss concerns that were raised as a result of the 2022 OJA Office of Public Integrity licensing and certification assessment for the Juvenile Detention Center.

41.     Between May 9, 2022 and May 5, 2023, OJA continued to monitor developments at the Juvenile Detention Center, making unannounced visits regularly to address these concerns.

42.     On May 3, 2023, Brown met with the Tulsa County Public Defender's Office to address comprehensive concerns about the Juvenile Detention Center.  At that meeting, Brown acknowledged the public defender's following concerns:

      a.     The juvenile residents did not go to school regularly;

      b.     The juvenile residents spent significant amounts of time on lockdown, during all hours of the day and on weekends;

      c.     The juvenile residents stayed on restriction/lockdown for days at a time, as opposed to hours;

    d.      Discipline was utilized for groups of juvenile residents, as opposed to individuals;

    e.      Juvenile residents were not allowed to take regular showers;

    f.      Juvenile Detention Center staff was intoxicated on illegal substances while at work;

    g.      Juvenile residents were getting "vape pens" in the Juvenile Detention Center; and,

    h.      Medications were not being properly dispensed, administered or monitored for compliance.

43.    On May 5, 2023, OJA placed the Juvenile Detention Center on probation.  In a letter to BOCC, Brown noted that issues that "have remained out of compliance for the past 11 months" included "youth being kept in their rooms/isolated, education concerns, and problems handling grievances and their resolutions."

44.    On May 17, 2023, a meeting was held to address a corrective plan, due to the Juvenile Detention Center's probationary status. In attendance at this meeting, among others, were Holt, Brown, Taylor, Edwards, Tunley, as well as various representatives from the Tulsa County District Attorney's office, the Tulsa County Public Defender's office, and at least one BOCC Tulsa County Commissioner.

45.    Despite the purpose of the meeting being the formation of a corrective plan, Juvenile Bureau denied issues at the Juvenile Detention Center.  At least one member of the Tulsa County Public Defender's office advised BOCC, at that time, that it was subjecting itself to a federal civil rights lawsuit if it did not correct the conditions within the Juvenile Detention Center.

46.    The Juvenile Detention Center policies and procedures state that "[s]exual abuse of an inmate, detainee, or resident by another inmate, detainee, or resident includes any of the following acts, with or without consent of the detainee or resident, is coerced into such act by

overt or implied threats of violence, or is unable to consent or refuse. **No juvenile in custody can legally consent to sexual behavior**." Policy 00-01, PREA Compliance Requirement at IV(C). Tulsa County Juvenile Detention Home, Policy and Procedure Manual ("Manual"), Policy 00-01, PREA Compliance Requirement at IV(C) (emphasis in original).

47.     The Manual further provides that the "Tulsa County Juvenile Detention Home (TCJDH), in accordance with State Statute 10A O.S., § 1-2-101 and the Oklahoma Office of Juvenile Affairs Policy, has a ZERO TOLERANCE stance towards all forms of sexual abuse and sexual harassment. TCJDH will take appropriate action to prevent, detect, and respond to all forms of sexual abuse and sexual harassment in compliance with the Prison Rape Elimination Act (PREA) of 2003." Manual at Policy 00-02, Prison Rape Elimination Act (PREA) of 2003, PREA Compliance, Coordinated Facility Response at I.

48.     From June 2023 to March 2024, CHILD DOE 2 was in custody at the Juvenile Detention Center. During this period of detention, CHILD DOE 2 was raped and sexually assaulted, multiple times, by Defendant Raymond, who was a nurse at the Juvenile Detention Center during that time.

49.     Raymond would proscribe "heat treatments" for CHILD DOE 2 and provide said treatments in a one-on-one setting, in order to engage in sexual relations with CHILD DOE 2.

50.     The Juvenile Detention Center policies and procedures states that "Employees will not provide any juvenile/client with any item(s) of contraband, i.e., any item(s) prohibited for all juveniles/clients by Juvenile Bureau or department/facility policy or prohibited for a specific juvenile/client or group of juveniles/clients by administrative or supervisory directive." Tulsa County, Juvenile Bureau of the District Court/Administration & Management/Personnel Policies, Policy File Number JBDC 0005, Policy Code of Conduct ("Code of Conduct") at ¶ 11.

51.     Raymond would provide CHILD DOE 2 with "vape pens" or e-cigarettes in exchange for CHILD DOE 2 having sex with Raymond.

52.     The Juvenile Detention Center policies state that "[a]ny staff member with a substantiated allegation of the sexual abuse or harassment of a resident shall be terminated and reported to local authorities for legal prosecution."  Manual at Policy 00-01, PREA Compliance Requirement at IV(D).

53.     By the end of 2023, PARENT DOE 2 reported that her child, CHILD DOE 2, had received "vape pens" from Defendant Currington.

54.     Raymond was never terminated but was merely transferred from Juvenile Detention Center to David L. Moss Correctional Center; however, upon information and belief, to date, none of the Defendants, nor any of their personnel or representatives, ever made a child abuse referral pursuant to OKLA. STAT. tit. 10A, § 1-2-201.

55.     Plaintiffs JANE DOE 1 and JANE DOE 2 were both in custody at the Juvenile Detention Center from June 2023 to August 2023.  During this period of time both JANE DOE 1 and JANE DOE 2 were repeatedly sexually assaulted and harassed by Defendant Doyle.

56.     The Code of Conduct states that "Employees will not bring or cooperate with others in bringing illegal drugs, unauthorized weapons or ammunition, beverages containing alcohol, or other dangerous items into or upon any Juvenile Bureau or other Tulsa County facility, building or vehicle, or onto any surrounding grounds, parking area or property."  Code of Conduct at ¶ 12.

57.     At least from June 2023 to August 2023, Doyle provided marijuana gummies and other marijuana-based products to multiple juveniles in the Juvenile Detention Center, including JANE DOE 1 and JANE DOE 2.

58.     Under the Code of Conduct, "Employees will avoid contact with current and former clients outside the context of professional interaction. NOTE: Contact with current and former clients is unacceptable if such contact is nonprofessional, social, and/or otherwise inappropriate, unless approval of the interaction has been obtained in advance from the department supervisor or facility director. (Department supervisors and facility directors may have differing levels of tolerance in this regard. Employees are thus encouraged not to violate the contact prohibition without first obtaining guidance concerning the department/facility's specific contact policies.)"  Code of Conduct at ¶ 47(a).

59.     At some point between June 2023 and August 2023, JANE DOE 2 was released for a period of time from custody. During her period of release, Doyle sent JANE DOE 2 unprovoked messages requesting sex and sending a picture of his penis.

60.     Between June 2023 and August 2023, among other things, Doyle:

a.     entered JANE DOE 1's cell, to "snake" her toilet and licked her;

b.     choked JANE DOE 1 in a sexual manner;

c.     grabbed his penis in front of JANE DOE 1;

d.     repeatedly attempted to get JANE DOE 1 to grab and touch him in a sexual manner;

e.     showed JANE DOE 1 a picture of his penis; and,

f.     told JANE DOE 1 to "lift" her shirt and expose her breasts to him, to which she complied.

61.     Between June 2023 and August 2023, Doyle stated to JANE DOE 2 that he found JANE DOE 2's friend on Facebook, while JANE DOE 2 was using the women's restroom.

62.     Between June 2023 and August 2023, Doyle repeatedly made sexually-explicit remarks and verbal advances to both JANE DOE 1 and JANE DOE 2.

63.     Between June 2023 and August 2023, Doyle regularly gave JANE DOE 1 and JANE DOE 2 unauthorized privileges, such as use of his cellphone, use of the computer facilities in the Juvenile Detention Center, and unauthorized freedoms within the physical spaces of the Juvenile Detention Center.

64.     From June 2023 to the present, the cameras in Unit B, JANE DOE 1's and JANE DOE 2's unit, of the Juvenile Detention Center have been inoperable.  Upon information and belief, Unit B was originally a male unit but the female residents were transferred there, due to the camera issues.  The inoperable camera situation was made known to the residents in the Juvenile Detention Center and provided the ability for multiple policy violations and resident abuses.

65.     Between June 2023 and August 2023, Defendant Treadway recruited JANE DOE 1 to write and pass romantic notes to a male juvenile resident, with whom Treadway was engaged in an ongoing relationship.

66.     The Manual States that "It is the responsibility of every staff member to report possible sexual abuse or sexual harassment or residents or any person in our environment. Manual at Policy 00-02, Prison Rape Elimination Act (PREA) of 2003, PREA Compliance, Coordinated Facility Response at IV(C).

67.     From June 2023 to August 2023, Defendants Treadway, DO Shalonda, DO Kelly, Miss Carrie, and Miss Torrie, all witnessed and personally observed Doyle's sexually inappropriate behavior and other inappropriate conduct, regarding JANE DOE 1 and JANE DOE 2, as well as other juvenile residents of the Juvenile Detention Center, and not only failed to intervene, but actually encouraged Doyle's behaviors.

68.     Prior to their release from the Juvenile Detention Center, both JANE DOE 1 and JANE DOE 2 were interviewed, in the presence of their lawyers, after multiple juvenile residents tested positive for marijuana, because Doyle had provided several residents gummies.

69.     During her interview, JANE DOE 1 disclosed Doyle's sexual assaults and harassments, as well as the various improprieties from multiple Defendants, directly to Juvenile Bureau personnel, including Taylor and Currington, among others.  JANE DOE 1 also provided a written statement as a part of this interview.

70.     During her interview, JANE DOE 2 also disclosed multiple improprieties regarding Juvenile Detention Center personnel, including Doyle, and specifically disclosed the inoperable cameras in "Unit B."  JANE DOE 2's interview was recorded.

71.     From November 2023 to May 2024, CHILD DOE 5 was in custody at the Juvenile Detention Center. During this period of detention, CHILD DOE 5 was sexually assaulted and harassed by Defendant Hines, who was a detention officer at the Juvenile Detention Center during that time.

72.     From November 2023 to May 2024, Hines told CHILD DOE 5 to tell CHILD DOE 1 to put "Vaseline" on CHILD DOE's butt to make sure it did not hurt when Hines had sex with CHILD DOE 1.

73.     CHILD DOE 5 witnessed Hines rape of CHILD DOE 1.

74.     From November 2023 to May 2024, Hines showed CHILD DOE 5 pornography, including videos of Hines having sex with other Juvenile Detention Center personnel and videos of Hines raping other juvenile detainees at the Juvenile Detention Center.

75.     Between November 2023 and May 2024, Hines told CHILD DOE 5 that "your dick is big today."

76.     Between November 2023 and May 2024, Hines propositioned CHILD DOE 5 on multiple occasions and CHILD DOE 5 touched Hines' leg at least once.

77.     From January 2024 to March 2024, CHILD DOE 4 was in custody at the Juvenile Detention Center.  During this period of detention, CHILD DOE 4 was sexually assaulted and harassed by Hines.

78.     From January 2024 to March 2024, Hines would show pornographic images and videos to CHILD DOE 4 on his Apple Watch.  These videos would include Hines having sex with other individuals.

79.     From January 2024 to March 2024, Hines would supply CHILD DOE 4 with marijuana-based products.

80.     Between January 2024 to March 2024, Hines made sexually inappropriate comments to CHILD DOE 4, such as "Goodnight, Honey Buns" as CHILD DOE 4 was going to bed.

81.     From February 2024 to the present, CHILD DOE 3 was in custody at the Juvenile Detention Center.  During this period of detention, CHILD DOE 3 was sexually assaulted and harassed by Hines.

82.     From February 2024 to the present, Hines would require CHILD DOE 3 to take his pants off to go to bed, inferring to CHILD DOE 3 that this was Juvenile Detention Center policy.

83.     From February 2024 to the present, Hines provided "vape pens" and sodas to CHILD DOE 3, multiple times.

84.     From February 2024 to the present, Hines would allow CHILD DOE 3 to use his personal cellphone to have videoconference calls with his girlfriend.  CHILD DOE 3 was shirtless for one or more of these calls.

85.     Between February 2024 to the present, Hines called CHILD DOE 3 "cute" while CHILD DOE 3 was on a FaceTime call with his girlfriend, who observed the interaction.

86.     Between February 2024 to the present, Hines touched CHILD DOE 3's butt on at least one occasion.

87.     From February 2024 to the present, Hines disclosed to CHILD DOE 3 that he was paying other juvenile residents money in exchange for performing sex acts with those residents.

88.     From February 2024 to April 2024, CHILD DOE 6 was in custody at the Juvenile Detention Center. During this period of detention, CHILD DOE 6 was sexually assaulted and harassed by Hines.

89.     Between February 2024 and April 2024, Hines attempted to sexually touch CHILD DOE 6 while he was alone in his cell, including attempting to touch CHILD DOE 6's genitals.

90.     Upon information and belief, inappropriate photographs of CHILD DOE 6 were found on Hines' phone.

91.     Between February 2024 and April 2024, Hines propositioned CHILD DOE 6 on multiple occasions.

92.     Between February 2024 and April 2024, Hines provided CHILD DOE 6 with marijuana-based products.

93.     Upon information and belief, Hines attempted to contact CHILD DOE 6 after being released from custody in the Juvenile Detention Center.

94.     From February 2024 to May 2024, CHILD DOE 7 was in custody at the Juvenile Detention Center. During this period of detention, CHILD DOE 7 was sexually assaulted and harassed by other juvenile residents in the presence of Juvenile Detention Center personnel, who failed to intervene or prevent said abuses.

95.     Between February 2024 and May 2024, CHILD DOE 7 was sexually threatened by a group of juvenile residents and disclosed the harassment/threats to Juvenile Detention Center staff.

96.     At no point did BOCC or Juvenile Bureau address or rectify CHILD DOE 7's disclosures or follow up on the allegations of harassment.

97.     From February 2024 to May 2024, the Juvenile Detention Center was personally aware of CHILD DOE 7's diagnoses of Attention Deficit/Hyperactivity Disorder, Oppositional Defiant Disorder and Intellectual Development and Disability; however, Juvenile Detention Center staff never gave CHILD DOE 7 correct prescription dosages for various medications.

98.     The Manual does not contain any provision that allows the Juvenile Detention Center to mandate a haircut for a juvenile resident.  Further, the Manual specifically states that "[h]air style will be limited only to a shorter cut of the 'existing style cut' that the resident has. No 'buzz cut' or drastic departure from that style cut may be made, such as long hair to a 'Bald Cut.'  Only conservative modification of the hair is acceptable, whether male or female resident." Manual at Policy 04-07, Hair Care Services at IV(B)(3).

99.     Between February 2024 to May 2024, the Juvenile Detention Center forced CHILD DOE 7 to cut off all their hair, from long to short, in direct violation of the Manual.

100.    On March 9, 2024, Hines molested his stepsister's child while babysitting for her. Hines previously took pictures of the child's genitalia.  A contemporaneous police report of the

March 9, 2024 incident was prepared and, presumably, disclosed and disseminated to Juvenile Bureau and OJA, respectively.  Hines remained employed well into April 2024.

101.    From March 2024 to April 2024, CHILD DOE 1 was in custody at the Juvenile Detention Center. During this period of detention, CHILD DOE 1 was raped by Hines.

102.    On April 6, 2024, Hines physically raped CHILD DOE 1.  This rape was witness by multiple juvenile residents at the Juvenile Detention Center, including one or more of the Plaintiffs.

103.    Upon information and belief, the April 6, 2024 incident is not the only instance of sexual abuse perpetrated by Hines upon CHILD DOE 1 during CHILD DOE 1's detention at the Juvenile Detention Center.

104.    The discovery of CHILD DOE 1's rape resulted in the Tulsa County criminal felony case, styled *State of Oklahoma v. Jonathan Michael Hines*, CF-2024-1559.  Hines remains in custody on charges of human trafficking, possession of a cellphone in jail, and destroying evidence.

105.    As of April 16, 2024, Juvenile Bureau was aware of CHILD DOE 1's rape and had not disclosed the incident to CHILD DOE 1's legal counsel.

106.    On April 17, 2024, Currington disclosed the April 6, 2024 rape and noted that an "internal investigation" was initiated.  Currington's email was sent to multiple parties, including various personnel with OJA; however, Currington excluded CHILD DOE 1's legal counsel from said disclosures.

107.    On April 19, 2024, at approximately 6:30 p.m., a Juvenile Detention Center female detention officer threatened CHILD DOE 1, through counsel, into silence regarding the April 6, 2024 rape.  Specifically,

a.      The female detention officer approached a Tulsa County public defender in the parking lot of the Juvenile Detention Center;

b.      The detention officer stated to counsel that "you need to tell your client to keep his mouth shut."

c.      The detention officer also disclosed that the Juvenile Detention Center employees were instructing the juvenile residents that if any of them discuss the April 6, 2024 incident, "detention will get shut down and all of the kids will be sent to [David L. Moss], and you know what happens to kids at DLM."

d.      The detention officer stated that "what happened" between CHILD DOE 1 and Hines was agreed upon and between them, so everyone should just let it go.

e.      The detention officer stated that CHILD DOE 1 got what he bargained for.

108.    On April 24, 2024, at 11:03 a.m., Tulsa County Public Defender Juvenile Division Supervisor notified various personnel with OJA and Juvenile Bureau, specifically including Taylor, Currington, and Cartmell, about the April 19, 2024 incident regarding a female detention officer and noting a "culture" within the Juvenile Detention Center that promotes harm to the juvenile detainees.

109.    On April 24, 2024 at 11:27 a.m., Judge Kevin Gray issued correspondence to Taylor, copying Currington and Brown, noting his receipt of the correspondence sent earlier that morning by the Tulsa County Public Defender's office and further noting his concerns.  Judge Gray stated:

I'm sure you read the email from Ms. Feldhake that she sent a short while ago. They brought the detention officer's conversation to my attention yesterday, and it is quite disturbing. I do agree that it worries me that this exemplifies a culture that might not understand the magnitude of the responsibility that detention officers carry with them as they care for some of our most vulnerable young citizens. I would ask that there be a mandatory meeting and training done as soon as possible to discuss issues surrounding inappropriate contact with detainees, specifically sexual contact. I know that you know this, but it appears that some of the staff either does not know or simply disagrees with the reality that it is a crime to engage in ANY sexual contact with a detainee, even if that contact is initiated by or done willingly by a

detainee. Not only is it a crime, but a conviction of such a crime will place an offender on the Sex Offenders Registry. Additionally, I would like for a part of that training to make clear to the detention officers that it is absolutely inappropriate for them to encourage the detainees not to talk about incidents, not to report incidents, or to otherwise share information they have about incidents. It is astonishing to me that someone would make such comments to our detainees. The detainees should ABSOLUTELY be reporting such contact to supervisors and/or their attorneys, and detention leadership should address the issues appropriately. The staff also needs to be informed (because clearly this particular detention officer does not know) that federal and state law would not allow our detainees to be simply transferred to DLM if our detention facility were to either close or lose its license. If they don't know, they need to be educated about the law. It appears to me that any mention of DLM to the detainees would be designed to frighten or otherwise intimidate the detainees into silence. That is also unacceptable and inappropriate.

Additionally, I would like to review our detention center's policies regarding the reporting of critical incidents such as the one that occurred the other day, to take into account the related but particular needs of both a personnel investigation and a criminal investigation. I understand the need to make sure that detention ascertains quickly what, if any, incident occurred so as to take proactive action regarding suspending or otherwise reassigning personnel until a thorough investigation is completed. That said, we must ensure that a personnel investigation neither hampers nor harms any subsequent criminal investigation. We also need to ensure that all detention leadership is clear on who needs to be informed about such an incident, when they need to be informed, and what law enforcement agency should take the lead on any criminal investigation. It is my position that as soon as any safety or security issues are quickly resolved, that law enforcement needs to be IMMEDIATELY called to initiate a criminal investigation. The delay in engaging law enforcement should not be measured in days, but likely in minutes or an hour. Coupled with that should be immediate notification to a detainee's parents and attorney, not as an afterthought but as a quick response to the incident. I would like to ensure that our policies and procedures reflect these positions. If not, they need to be updated and/or changed.

110.    At 3:55 p.m. that same day, Taylor responded to Judge Gray's email noting that he had identified the female detention officer from the April 19th interaction with the public defender and that she denied making those comments.  In that same email, Taylor noted that "[o]ur continued improvement is reflected in *the increased confidence of employees* when working with complex and hostile residents." To be clear Taylor was undisputedly aware that Hines, his employee, raped CHILD DOE 1 approximately two weeks earlier.

111.    In that same communication, Taylor also touted that the Juvenile Detention Center "continues to receive accolades from our state licensing agency, which monitors our facility monthly."  OJA is the "licensing agency" referenced by Taylor.

112.    On April 25, 2024, correspondence was sent from the Tulsa County Public Defender's Office to Brown, copying Cartmell and Tulsa County District Judges Kevin Gray and Dawn Moody, requesting "immediate action regarding Tulsa County Juvenile Detention."  The correspondence outlined:

    a.     the April 6, 2024 rape incident;

    b.     past incidents of sexual assault that had occurred within the confines of the Juvenile Detention Center in the past eighteen (18) months; and

    c.     The April 19, 2024 physical threats made by a female detention officer to the Tulsa County public defender in an attempt to bully CHILD DOE 1 into silence.

The correspondence concluded noting "[i]f immediate action is not taken to ensure the safety of these children, [the Tulsa County Public Defender's Office] will not hesitate to get the ball rolling so that a federal lawsuit may be brought."

113.    On May 6, 2024 Taylor was fired as Director of Juvenile Bureau. Edwards, who was the First Deputy Director at the time, replaced Taylor as Acting Director.

114.    To date, no publicly-available corrective action, by either Juvenile Bureau or OJA, has occurred to protect the children held within the confines of the Juvenile Detention Center.

115.    Relative to juvenile rights, the Manual states as follows:

The Oklahoma Juvenile Code (10 O.S. 7302-6.3) defines the rights of a juvenile in custody. This policy is not intended to infringe on the stated rights of any juvenile, but put in place an organized predictable system of discipline that is consistent with the goals and mission of the Detention Home. This system is designed to utilize positive approaches that encourage the juvenile to be personally responsible for his or her actions. The degree of disciplinary actions, sanctions, or related restrictions

initiated on a resident shall be directly related to the severity of the rule broken as detailed in the resident orientation form and disciplinary guidelines. The objective of disciplinary sanctions shall be to hold residents accountable and encourage responsible behavior within the program.

Manual at Policy 03-28, Disciplinary Guidelines at I. Even juvenile residents under "room confinement", per the Juvenile Detention Center policy, "shall be afforded living conditions, essential services and privileges approximating those available in the program. No resident will be denied access to mail, daily exercise, regular phone calls, *visitation*, access to attorney or worker due to disciplinary sanction." *Id.* at 5(c) (emphasis added).

116.    Furthermore, "A denial of visitation privileges shall be based on the safety, security, and order of the facility and the safety of the individuals involved. The resident shall be notified in writing the Supervisor of a denial of visitation that includes the name of the restricted or prohibited visitor, the name of the person making the decision, and the resident's right to appeal the decision."  Manual at Policy 05-10, Resident Visitor Program at B(1).

117.    By May 2023, BOCC, Juvenile Bureau, and OJA were put on notice that swaths of juvenile residents were being placed on "lockdown" during all hours of the day, in clear violation of policy.

118.    It is the visitation policy within the Juvenile Detention Center that juvenile residents can only have visitation, even with family members, during the weekends.

119.    During their periods of detainment, multiple juvenile Plaintiffs reported having their rights to visitation with their family members revoked, even for infractions as minor as having "two books" in their cell.  These infractions and restrictions often came in tandem with those same juveniles declining to perform specific sexual acts with various detention officers and/or personnel within the Juvenile Detention Center, including but not limited to multiple Defendants.

120.     BOCC, Juvenile Bureau, and OJA have exhibited a clear culture of weaponizing a disciplinary system into not only retaliating against juvenile residents who refuse to comply with the sexual advances of the detention officers and other personnel within the Juvenile Detention Center, but also to cut off those juvenile residents from any means of contemporaneously reporting sexual abuse, even rape, to their family members, instead becoming wholly reliant on the reporting system within the very administration that allowed the abuses in the first place.

121.     Detainees of an incarceration facility are extraordinarily vulnerable and subject to being preyed upon by the detention personnel; however, these vulnerabilities are compounded for juvenile detainees.  For this reason, the law of the State of Oklahoma specifically protects such persons.  Under Oklahoma criminal statutes, any state, federal, county, municipal or political subdivision employee who has sexual intercourse with a person under the supervision of a sheriff is guilty of the crime of rape. OKLA STAT. tit. 21, § 1111(A)(7).  These same laws protect minors even further.  *Id.* at § 1111(A)(1) and (8).

122.     Various Defendants' acts of depravity and crimes were facilitated by a total breakdown in supervision, security and housing within the Juvenile Detention Center.

123.     Despite the Juvenile Detention Center being placed on probation in May 2023 for documented May 2022 violations, BOCC, Juvenile Bureau, and OJA, as well as Taylor, Edwards, Currington, Tunley, Cartmell, Holt, and Brown, did nothing to change the policies, procedures, or culture of the Juvenile Detention Center or otherwise take action to protect Plaintiffs and other juvenile detainees.

124.     Upon learning of legitimate concerns from the Tulsa County Public Defenders' Office, BOCC, Juvenile Bureau, and OJA, as well as Taylor, Edwards, Currington, Tunley, Cartmell, Holt, and Brown, did nothing to change the policies, procedures, or culture of the

Juvenile Detention Center or otherwise take action to protect Plaintiffs and other juvenile detainees.

125.     Upon learning that CHILD DOE 2 was raped by Raymond in mid- to late-2023, BOCC, Juvenile Bureau, and OJA, as well as Taylor, Edwards, Currington, Tunley, Cartmell, Holt, and Brown, did nothing to change the policies, procedures, or culture of the Juvenile Detention Center or otherwise take action to protect Plaintiffs and other juvenile detainees.

126.     Upon learning that JANE DOE 1 and JANE DOE 2 were sexually assaulted and harassed by Doyle by August 2023, BOCC, Juvenile Bureau, and OJA, as well as Taylor, Edwards, Currington, Tunley, Cartmell, Holt, and Brown, did nothing to change the policies, procedures or culture of the Juvenile Detention Center or otherwise take action to protect Plaintiffs and other juvenile detainees.

127.     Despite receiving definitive proof that CHILD DOE 1 was raped by Hines in April 2024, BOCC, Juvenile Bureau, and OJA, as well as Taylor, Edwards, Currington, Tunley, Cartmell, Holt, and Brown, did nothing to change the policies, procedures, or culture of the Juvenile Detention Center or otherwise take action to protect Plaintiffs and other juvenile detainees.

128.     The Juvenile Detention Center promotes rape culture within its walls and each and every one of the Defendants is culpable, in some fashion, for committing said act, promoting said culture or for turning a blind eye, despite overwhelming information, evidence, and documented proof that said depravities were occurring to children, for years.

129.     Defendants failed to provide adequate housing, supervision, and security for Plaintiffs as juvenile detainees.

130.     Defendants' deliberate indifference to the clear and present risks to Plaintiffs' safety, as well as the deliberate indifference to the incontrovertible proof of rape incidents, was a direct and proximate cause of each of Plaintiffs' serious injuries and damages.

131.     Defendants' deliberate indifference to the safety and welfare of Plaintiffs is evinced by their persistent violation of numerous provisions of the Manual, listed above, as well as the Prison Rape Elimination Act ("PREA"), adopted by OJA in December 2019.  In fact, the PREA states at the very beginning:

> The Office of Juvenile Affairs (OJA) has a <u>ZERO-TOLERANCE</u> toward all forms of sexual abuse and sexual harassment.  OJA will take appropriate action to prevent, detect, and respond to all forms of sexual abuse and sexual harassment in compliance with the Prison Rape Elimination Act (PREA) of 2003. (115.311 (a))

132.     Among other provisions, the PREA further states:

➤ Retaliation - An act of vengeance, covert or overt action, or threat of action, taken against a juvenile in response to the juvenile's complaint of sexual misconduct, in the reporting or investigation of sexual misconduct, regardless of the merits or the disposition of the complaint is prohibited. Examples of acts of retaliation are unnecessary discipline, intimidation, unnecessary changes in work or program assignments, unjustified transfers or placements and unjustified denials of privileges or services.

➤ Institutional Superintendents shall ensure that facility staff discourage and prevent sexual misconduct by providing clear definitions of prohibited conduct, establishing uniform methods for the prompt reporting and investigation of allegations of misconduct, and prescribing sanctions for both substantiated misconduct and false allegations. Sexual misconduct between staff and juveniles, volunteers or contract personnel and juveniles, regardless of consensual status, is prohibited and subject to administrative and criminal disciplinary sanctions.

➤ Institutional Superintendents shall develop, implement, and document a staffing plan that provides for adequate levels of staffing, and, where applicable, video monitoring, to protect juveniles against sexual abuse. (115.313 (a))

➤ When designing or acquiring new facilities and in planning any substantial expansion or modification of existing facilities, OJA shall consider the

effect of the design, acquisition, expansion, or modification upon OJA's ability to protect juveniles from sexual abuse. (115.318 (a)) D.

➢ When installing or updating a video monitoring system, electronic surveillance system, or other monitoring technology, OJA shall consider how such technology may enhance OJA's ability to protect juveniles from sexual abuse. (115.318 (b))

➢ OAC 377:3-1-25. Abuse, neglect, and caretaker misconduct of a child in OJA custody and placed in a secure facility or other facility operated by or through contract with OJA

    (a)    Requirements for reporting incidents of abuse and neglect. Title 10A O.S. § 1-2-101 requires every person who, in good faith and exercising due care, has reason to believe that a child under the age of eighteen (18) is a victim of abuse or neglect to report the condition or incident to the appropriate office for investigation through the DHS statewide centralized hotline. For the purposes of the reporting requirements for this subchapter, abuse shall include sexual abuse and sexual harassment. An employee who, in good faith and exercising due care, has reason to believe that a child is a victim of abuse or neglect shall make an immediate, verbal or email report, as required by 10A O.S. § 1-2-101 and to the supervisor who shall ensure a report is made to the OJA Office of Advocate General, or as required by 10A O.S. § 1-2-102 to the DHS hotline, when: (1) the employee has reason to believe such child has been the victim of abuse or neglect; (2) a child, parent, guardian, or other person makes an allegation of abuse or neglect of such child. …

➢ All OJA staff shall report immediately any knowledge, suspicion, or information they receive regarding an incident of sexual abuse or sexual harassment that occurred in a facility, whether or not it is part of the agency; retaliation against juveniles or staff who reported such an incident; and any staff neglect or violations of responsibilities that may have contributed to an incident or retaliation. (115.361 (a))

➢ All allegations of sexual abuse or sexual harassment are referred for administrative or criminal investigation. (115.322 (a)(b))

Each of these provisions states widely accepted minimum standards for the operation of Oklahoma juvenile detention facilities. The failure to uniformly and consistently observe such standards evidences deliberate indifference to the safety and security of juvenile detainees, generally, and Plaintiffs specifically. These standards were clearly and flagrantly violated. The

sexual rapes, abuses, harassment, etc., of Plaintiffs resulted from a total and complete breakdown in the minimum supervision, security, and housing practices that Defendants, across the board, are required to provide and/or ensure are followed.

133.    Defendants' deliberate indifference to Plaintiffs' health and safety was in furtherance of and consistent with policies, procedures, customs, and practices which BOCC, Juvenile Bureau, and OJA, as well as Taylor, Edwards, Currington, Tunley, Cartmell Holt, and Brown, promulgated, created, implemented, or possessed responsibility for the Juvenile Detention Center's operation.

134.    BOCC and Juvenile Bureau failed to promulgate and implement adequate housing and supervision policies responsive to the specific needs of juvenile detainees at the Juvenile Detention Center. BOCC and Juvenile Bureau have long been aware of instances of inappropriate and improper sexual contact at the Juvenile Detention Center, including rape and sexual abuses between staff members/detention officers and juvenile detainees, which can qualify as felony rape under Oklahoma law. Consistent with past practices, in the present case, when BOCC and Juvenile Bureau were on notice of sexual contact between staff and juveniles, nobody notified the District Attorney's office, the Public Defender's office, or the Oklahoma Department of Human Safety after learning of sexual contact between staff and juvenile detainees.  BOCC and Juvenile Bureau failed to take adequate corrective action to prevent additional instances and harm.

135.    Despite knowledge of inappropriate sexual contact, Taylor, Edwards, Currington, and Tunley failed to provide adequate facilities or promulgate and implement adequate policies, training, procedures, and guidelines to ensure the safety of juvenile detainees. The lack of adequate and appropriate supervision for juvenile detainees and the utter lack of

guidance for employees to follow at the Juvenile Detention Center as to the standard of supervision, security and care for juvenile detainees demonstrates a failure to train, failure to supervise, and deliberate indifference toward known risks to the health and safety of detainees like Plaintiffs.

136.     BOCC and Juvenile Bureau, as well as Taylor, Edwards, Currington and Tunley, have promulgated, and in fact profited, off perpetuating rape culture.  Through their deliberate indifference and conscious choices, these Defendants have knowingly allowed juvenile detainees, including Plaintiffs, to be raped, sexually abused, exploited, and harassed by multiple staff and personnel within the Juvenile Detention Center.  Indeed, Defendants have been aware of these facts and circumstances since mid-2023, likely before, and have elected to do nothing to change the policies, practices, procedures, or supervision within the Juvenile Detention Center.  Such action, and intentional inaction, amounts to deliberate indifference toward known risks to the health and safety of detainees like Plaintiffs.

137.     The "Office of Juvenile Affairs shall be responsible for the care and custody of a youthful offender who has been placed in the Office of Juvenile Affairs and shall have the duty and the authority to provide food, clothing, shelter, ordinary medical care, education, discipline and in an emergency to authorized surgery or other extraordinary care."  OKLA. STAT. tit. 10A, § 2-5-212(D).

138.     Despite their statutory responsibility and their "ZERO TOLERANCE policy" for sexual abuse, OJA, as well as Cartmell, Holt, and Brown, failed to promulgate and implement adequate safety measures to address the needs of the juvenile detainees at the Juvenile Detention Center.  These Defendants not only deferred to BOCC and Juvenile Bureau their statutory responsibilities owed to Plaintiffs and other juvenile detainees, despite the undisputed evidence

that juvenile detainees were being raped, sexually abused, sexually harassed, and physically abused by the personnel, detention officers, and staff at the Juvenile Detention Center for a considerable amount of time.   Indeed, Defendants have been aware of these facts and circumstances since mid-2023, likely before, and have chosen to do nothing to intervene in the pervasive culture within the Juvenile Detention Center.   Such action, and intentional inaction, amounts to deliberate indifference toward known risks to the health and safety of juvenile detainees like Plaintiffs.

139.   Among other things, BOCC is responsible for approving an annual budget for Juvenile Bureau, which includes the day-to-day operation of the Juvenile Detention Center. In this regard, BOCC was aware of Juvenile Bureau's non-compliance in the operation of the Juvenile Detention Center in May 2022 and received formal, written, documentation of the continued non-compliance in May 2023.   BOCC was further made personally aware of the continued deficiencies at the Juvenile Detention Center at a multi-agency meeting on May 17, 2023.   BOCC was well aware that these deficiencies, over the span of at least two (2) years, perpetuated an undue and preventable risk to juvenile detainees at the Juvenile Detention Center, for rape, sexual abuse and harassment. Despite this knowledge, BOCC approved a more than $13 million budget for "juvenile detention" for the 2023-2024 fiscal year, thereby intentionally allowing a deficient Juvenile Detention Center to continue its ongoing operation and, by proxy, perpetuate the ongoing rape culture within its confines.   Such action, and intentional inaction, amounts to deliberate indifference toward known risks to the health and safety of juvenile detainees like Plaintiffs.

140.   Hines, Zenzen, Doyle, Treadway, and Raymond, each individually and separately, committed one or more sexual abuses on juvenile detainees, including but not limited

to Plaintiffs, during their periods of employment at the Juvenile Detention Center. Such action clearly amounts to deliberate indifference toward known risks to the health and safety of juvenile detainees like Plaintiffs.

141.    Treadway, DO Shalonda, DO Kelly, Miss Carrie, and Miss Torrie, each witnessed, and maintained personal knowledge of, one or more sexual abuses on juvenile detainees, including but not limited to Plaintiffs, during their periods of employment at the Juvenile Detention Center.  Despite this personal knowledge, each of these Defendants not only elected not to report these abuses but conspired to further allow these abuses to continue within the Juvenile Detention Center.  Such action clearly amounts to deliberate indifference toward known risks to the health and safety of juvenile detainees like Plaintiffs.

142.    Upon information and belief, Defendants JOHN DOES 1-10 and JANE DOES 6-15 each either committed one or more sexual abuses on juvenile detainees, or witnessed or had personal knowledge of such abuses, including but not limited to Plaintiffs, during their periods of employment at the Juvenile Detention Center.  Such action clearly amounts to deliberate indifference toward known risks to the health and safety of juvenile detainees like Plaintiffs.

143.    As a direct and proximate result of Defendants' actions and failures to act, Plaintiffs and other juvenile detainees have suffered physical and emotional trauma, personal injury, mental pain and suffering, emotional distress, and other actual damages.

## CLAIMS FOR RELIEF

I.    CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES
(42 U.S.C. § 1983)

a.  *Allegations Applicable to Defendants Hines, Zenzen, Doyle, Raymond, and Treadway*

144.    Plaintiffs re-alleges and incorporates by reference paragraphs 1 through 143, as though fully set forth herein.

145.    The Fourteenth and/or Eighth Amendments to the U.S. Constitution protects Plaintiffs' right to be free from physical abuse at the hands of state actors and the right to personal security, liberty, dignity, and bodily integrity.

146.    Each of these Defendants sexually abused one or more of the Plaintiff's within the Juvenile Detention Center, between June 2023 and the present.

147.    On April 30, 2024, Currington disclosed that Zenzen sexually abused a male juvenile detainee, by grabbing his genitals, while said detainee was using the restroom.

148.    Between June 2023 and May 2024, Raymond raped CHILD DOE 2. Raymond would exchange "vape pens" for sex with CHILD DOE 2. BOCC, Juvenile Bureau, and OJA were made aware of this relationship, sometime in 2023, and transferred Raymond to David L. Moss as a corrective measure.

149.    Between June 2023 and August 2023, Doyle repeatedly sexually abused JANE DOE 1 and JANE DOE 2 and further abused an unknown number of juvenile detainees within the Juvenile Detention Center, resulting in the widespread dissemination of marijuana-based products through the Juvenile Detention Center.

150.    By August 2023, Treadway was involved in a romantic relationship with at least one male juvenile detainee at the Juvenile Detention Center and used JANE DOE 1 and JANE DOE 2 to exploit this vulnerable male juvenile detainee by sending correspondence to the detainee through JANE DOE 1 and JANE DOE 2.

151.    In April 2024, Hines raped CHILD DOE 1. Due to pornographic videos and photographs Hines showed other juvenile detainees at the Juvenile Detention Center, including

CHILD DOE 4 and CHILD DOE 5, the disclosure of money-for-sex to CHILD DOE 3, as well as the fact that an inappropriate photograph of CHILD DOE 6 is believed to have been found on Hines' phone, it is believed that Hines also raped more juvenile detainees while employed at the Juvenile Detention Center.

152.    Each of these Defendants exploited their positions of power by repeatedly sexually assaulting and raping the Plaintiffs and were therefore deliberately indifferent to the Plaintiffs' health and safety.

153.    As a direct and proximate result of Defendants' actions and failures to act, Plaintiffs and other juvenile detainees have suffered physical and emotional trauma, personal injury, mental pain and suffering, emotional distress, and other actual damages.

### b.  *Allegations Applicable to the County and the Juvenile Bureau (Monell Liability)*

154.    Plaintiffs re-alleges and incorporate by reference paragraphs 1 through 153, as though fully set forth herein.

155.    BOCC and Juvenile Bureau are "persons" for purposes of 42 U.S.C. § 1983.

156.    At all times pertinent hereto, the BOCC and Juvenile Bureau were acting under the color of state law.

157.    Juvenile Bureau was endowed by the BOCC with powers or functions governmental in nature, such that Juvenile Bureau became an instrumentality of the state and subject to its Constitutional limitations.

158.    BOCC and Juvenile Bureau are charged with implementing and developing the policies of OJA and the Oklahoma Juvenile Code with respect to the care and supervision of juvenile inmates that are housed at the Juvenile Detention Center, and has the responsibility to adequately staff the Juvenile Detention Center, and adequately train and supervise its employees.

159.    The Fourteenth Amendment requires municipalities to provide detained juveniles with reasonably safe conditions of confinement.

160.    As detained juveniles in custody, BOCC and Juvenile Bureau had a special relationship with Plaintiffs and had an affirmative duty to protect Plaintiffs from harm.

161.    BOCC and Juvenile Bureau violated Plaintiffs' rights to personal security and bodily integrity and breached its affirmative duty to Plaintiffs when it failed to provide Plaintiffs with reasonably safe conditions and when it facilitated, enabled, countenanced, approved, and permitted Plaintiffs' continued sexual abuse by staff at the Juvenile Detention Center.

162.    The aforementioned acts and/or omissions of Hines, Zenzen, Doyle, Raymond, and Treadway in being deliberatively indifferent to Plaintiffs' health and safety and violating Plaintiffs' civil rights were the direct and proximate result of customs, practices and policies which BOCC and/or Juvenile Bureau promulgated, created, implemented and/or possessed responsibility for.

163.    Such policies, customs and/or practices include, but are not limited to:

  a. The failure to promulgate and implement adequate and appropriate housing, supervision policies, procedures or guidelines responsive to the special needs of juvenile inmates;

  b. The failure to ensure adequate supervision and safety precautions with respect to areas that are not monitored via surveillance equipment, or "blind spots," within the Juvenile Detention Center;

  c. The pattern and practice of understaffing the Jail, leaving juvenile inmates vulnerable and increasing the risk of harm;

  d. The failure to take precautions to prevent danger to the health and wellbeing of juvenile inmates;

  e. The failure to train Jail personnel and staff regarding: the supervision of juvenile inmates within the Jail and the special security needs of juvenile inmates; and

f. The failure to take adequate corrective measures, such as disciplinary action, to address known sexual assaults by Jail personnel, and to prevent such sexual assaults from occurring.

164. Juvenile Bureau and BOCC knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of juvenile inmates like Plaintiffs.

165. For instance, by May 2023, BOCC and Juvenile Bureau possessed actual knowledge, in writing, of the inadequate facilities, supervision and security within the Juvenile Detention Center, which gave rise to the heightened risks of sexual abuses and harassment, including rape, to the juvenile detainees, including Plaintiffs.

166. Nevertheless, BOCC and Juvenile Bureau failed to take reasonable steps to alleviate those risks in deliberate indifference to juvenile inmates' health and safety.

167. BOCC and Juvenile Bureau tacitly approved of Juvenile Detention Center staff's unconstitutional conduct by failing to act, amounting to an official policy of inaction. BOCC and Juvenile Bureau had ample notice and knowledge of this likelihood and existence of a continuing pattern of abuse and unconstitutional behavior.

168. BOCC and Juvenile Bureau also acted affirmatively to promote and maintain conditions in the Juvenile Detention Center and to promote and maintain inadequate hiring, training, retention, and supervision of Juvenile Detention Center Staff such that the continued abuse of detained children, including Plaintiffs, was virtually guaranteed.

169. In this manner, BOCC and Juvenile Bureau knowingly, and with deliberate indifference and conscious disregard, created and/or increased the risk of the danger—i.e., sexual abuse of Plaintiffs by Juvenile Detention Center Staff—and affirmatively put Plaintiffs in harm's way.

170. These affirmative acts by the BOCC and Juvenile Bureau, taken as a whole and in the context of known abuse at the Juvenile Detention Center, increased the danger to the Plaintiffs and amounted to egregious and outrageous behavior.

171. As a direct and proximate result of Defendants' actions and failures to act, Plaintiffs and other juvenile detainees have suffered physical and emotional trauma, personal injury, mental pain and suffering, emotional distress, and other actual damages.

### c. Allegations Applicable to Defendants Taylor, Edwards, Currington, Tunley, Cartmell, and Holt (Supervisory Liability)

172. Plaintiffs re-alleges and incorporates by reference paragraphs 1 through 171, as though fully set forth herein.

173. In their supervisory roles with Juvenile Bureau, Taylor, Edwards, Currington, and Tunley were responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the Jail, including the policies, practices, procedures, and/or customs which led to violations of Plaintiffs' Constitutional rights as set forth in this Amended Complaint.

174. Cartmell and Holt were, at all pertinent times, employed by the State of Oklahoma as the Executive Directors of OJA. As Executive Director, Cartmell and Holt were responsible for the overall management of OJA's portfolio of operated and contracted programs and services. As Executive Director, Cartmell and Holt had responsibility for maintaining OJA policies, protocols and customs and a supervisory duty to assure that juvenile residents under OJA custody, like Plaintiffs, have their basic safety, medical and mental health care needs met.

175. There is an affirmative link between the aforementioned violation of the Plaintiffs' constitutional rights and policies, practices, and/or customs (as alleged above) which Taylor, Edwards, Currington, Tunley, Cartmell, and Holt possessed responsibility for.

176.    The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to the Plaintiffs' health and safety and violating Plaintiffs' civil rights were the direct and proximate result of customs, practices, and policies which Defendants promulgated, created, implemented and/or possessed responsibility for.

177.    These Defendants knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of juvenile inmates like Plaintiffs.

178.    These Defendants disregarded the known and/or obvious risks to the health and safety of citizens like Plaintiffs.

179.    Defendants Taylor, Edwards, Currington, Tunley, Cartmell, and Holt, through their continued encouragement, ratification, and/or approval of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, have been deliberately indifferent to juvenile inmates' health and safety.

180.    As a direct and proximate result of Defendants' actions and failures to act, Plaintiffs and other juvenile detainees have suffered physical and emotional trauma, personal injury, mental pain and suffering, emotional distress, and other actual damages.

## II.    FAILURE TO INTERVENE
### (42 U.S.C. § 1983)
### (*As to Defendants Treadway, Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4*)

181.   Plaintiffs re-alleges and incorporates by reference paragraphs 1 through 180, as though fully set forth herein.

182.   In the manner described above, by their conduct and under color of law, during the constitutional violations committed by Hines, Zenzen, Doyle, Raymond, and Treadway, each of

these Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity and duty to do so.

183.   Between June 2023 and August 2023, each of these Defendants witnessed, and maintained personal knowledge of, one or more sexual abuses on juvenile detainees, including JANE DOE 1 and JANE DOE 2, by Doyle.

184.   Between June 2023 and August 2023, each of these Defendants witnessed or otherwise had personal knowledge that Doyle was supplying marijuana-based products to multiple juvenile detainees within the Juvenile Detention Center, including JANE DOE 1 and JANE DOE 2, which resulted in widespread overdoses on marijuana by multiple juvenile detainees.

185.   Despite this personal knowledge, Defendants chose not to intervene to prevent the violation of the Plaintiffs' constitutional rights.

186.   These Defendants had a reasonable opportunity to prevent this harm but failed to do so.

187.   The misconduct described in this Claim for Relief was objectively unreasonable and was undertaken intentionally, with malice, willful and/or reckless indifference to the Plaintiffs' constitutional rights.

188.   As a direct and proximate result of Treadway, Jane Doe 1, Jane Doe 2, Jane Doe 3, and Jane Doe 4's failure to intervene to prevent the violation of Plaintiffs' constitutional rights, Plaintiffs and other juvenile detainees have suffered physical and emotional trauma, personal injury, mental pain and suffering, emotional distress, and other actual damages.

### III.    BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
### (COMMON LAW)
### *(As to Defendants OJA, BOCC, and Juvenile Bureau)*

189.   Plaintiffs re-alleges and incorporate by reference paragraphs 1 through 188, as though fully set forth herein.

190.   Defendants OJA, BOCC, and/or Juvenile Bureau entered into a contract for the operation of, among other things, the Juvenile Detention Center in accordance with applicable laws.

191.   That contract was made for the benefit of juvenile detainees who would end up in custody at the Juvenile Detention Center, like Plaintiffs.

192.   Defendants breached that contract in that they failed to perform their duties to protect intended third-party beneficiaries, including Plaintiffs.

193.   As a direct and proximate result of the actions and omissions of these Defendants arising from the contract, to which Plaintiffs were intended third-party beneficiaries, Plaintiffs suffered injuries.

194.   As a result of the acts and/or omissions of these Defendants, Plaintiffs have each been damaged in an amount in excess of $75,000.00.

### IV.    INJUNCTIVE RELIEF
### (COMMON LAW)
### *(As to Defendants OJA, BOCC, and Juvenile Bureau)*

195.   Plaintiffs re-alleges and incorporates by reference paragraphs 1 through 194, as though fully set forth herein.

196.   Defendants OJA, BOCC, and/or Juvenile Bureau's conduct continues to harm those Plaintiffs still in detention at the Juvenile Detention Center and other detainees.

197.   Thus, Plaintiffs request the Court issue a permanent injunction and corresponding declaratory relief pursuant to Fed. R. Civ. P. 57 and 65 compelling these Defendants to develop and implement constitutional policies, training, and supervision of their agents and employees with respect to the rights of juvenile detainees and protect them from the actions alleged herein.

198.   Thus, Plaintiffs request the Court issue a permanent injunction and corresponding declaratory relief pursuant to Fed. R. Civ. P. 57 and 65 compelling these Defendants to redress Defendants' ongoing deliberate indifference in policies, training, and supervision with respect to the serious needs of juvenile inmates with respect to the rights of Plaintiffs and other juvenile detainees and protect them from the actions alleged herein in violation of the Eighth and Fourteenth Amendments of the Constitution.

199.   Plaintiffs further request the Court issue a permanent injunction and corresponding declaratory relief pursuant to Fed. R. Civ. P. 57 and 65 compelling these Defendants to obtain a third-party audit of these Defendants' policies and procedures, and the Juvenile Detention Center to protect the Constitutional rights of Plaintiffs and other juvenile detainees and protect the juvenile detainees from the actions alleged herein.

200.   Plaintiffs further request the Court issue a permanent injunction and corresponding declaratory relief pursuant to Fed. R. Civ. P. 57 and 65 compelling these Defendants to appoint and maintain an unaffiliated and independent compliance officer with authority to enforce the constitutional policies, training, and supervision of their agents and employees with respect to the rights of Plaintiffs and other juvenile detainees and protect them from the actions alleged herein.

201.   Plaintiffs further request the Court issue a permanent injunction and corresponding declaratory relief pursuant to Fed. R. Civ. P. 57 and 65 compelling these Defendants to repair

and maintain all institutional guardrails, such as security cameras, intended to protect Plaintiffs still in the Juvenile Detention Center, and other juvenile detainees.

202.   Plaintiffs further request the Court issue a permanent injunction and corresponding declaratory relief pursuant to Fed. R. Civ. P. 57 and 65 compelling these Defendants to have all security camera footage taken at the Juvenile Detention Center going forward monitored and audited by an unaffiliated and independent third-party.

## V.   PUNITIVE DAMAGES

203.     Plaintiffs re-alleges and incorporates by reference paragraphs 1 through 202, as though fully set forth herein.

204.     Plaintiffs are entitled to punitive damages on their claims brought pursuant to 42 U.S.C. § 1983 as each of the individual Defendants' conduct, acts and omissions alleged herein constitute malicious and/or reckless or callous indifference to Plaintiffs' federally protected rights.

WHEREFORE, based on the foregoing, Plaintiffs pray that this Court grant the relief sought, including, but not limited to, actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from date of filing of suit, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), reasonable attorney fees, injunctive and declaratory relief as requested in Count IV, and all other relief deemed appropriate by this Court. Plaintiffs demand a jury trial on all claims and causes.

Respectfully submitted,

SMOLEN | LAW, PLLC


*/s/ Donald E. Smolen, II*
Donald E. Smolen, II, OBA #19944
Michael F. Smith, OBA #14815
Chris U. Brecht, OBA #22500
611 S. Detroit Ave.
Tulsa, OK  74120
P: (918) 777-4LAW (4529)
F: (918) 890-4529
don@smolen.law
michael@smolen.law
chrisbrecht@smolen.law
*Attorneys for Plaintiffs*